## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## AT COVINGTON

| | |
|---|---|
| **DONTAIE ALLEN**<br>**7156 Desmond Lane**<br>**Union, KY 41091** | **NO. _____** |
| **DERRICK BARNES**<br>**682 Boham Court**<br>**West Lafayette, IN 47906** | |
| **ADAM KUNKEL**<br>**6132 Titleist Lane**<br>**Burlington, KY 41005** | **COMPLAINT AND JURY DEMAND** |
| **MALIK CURRY**<br>**1223 Canvasback Drive**<br>**New Castle, DE 19720** | *Electronically Filed* |
| **ERIK STEVENSON**<br>**150 I Street SE**<br>**Washington, DC 20003** | |
| **DONTE INGRAM**<br>**9724 South Princeton Avenue**<br>**Chicago, IL 60628** | |
| **ROMAR REID**<br>**343 Tecumseh Avenue**<br>**Mount Vernon, NY 10553** | |
| **CAM TAYLOR BRITT**<br>**370 Silver Oak Drive**<br>**Dalton, GA 30132** | |
| **KAMERON DREW WILLIAMS**<br>**195 W. Davis Street, Apt. 122**<br>**Dallas, TX 75208** | |
| **CAMERON KRUTWIG**<br>**17N390 Ranch Road**<br>**Dundee, IL 60118** | |
| **VINCENT "TRE" MITCHELL**<br>**322 Maple Ridge Drive**<br>**Canonsburg, PA 15317** | |

**MATT CROSS**
**8 Garfield Avenue**
**Beverly, MA 01915**

**MARC CRANDALL LOVING**
**7416 Finchwood Lane**
**Toledo, OH 43617-2318**

**C.J. JACKSON**
**4031 E. Rock Wren Road**
**Phoenix, AZ 85044**

**DEREK CULVER**
**321 Kendal Avenue**
**Campbell, OH 44405**

**NATE ADRIAN**
**1209 Cheat Road**
**Morgantown, WV 26508**

**TAJZMEL SHERMAN**
**16407 Quailynn Drive**
**Missouri City, TX 77489**

**FILIP PETRUSEV**
**Milinka Kusica 1/3**
**11250 Belgrade**
**Serbia**

**NIGEL JOHNSON**
**44026 Florence Terrace**
**Ashburn, VA 20147**

**LUCAS WILLIAMSON**
**2340 W. Adams, Unit 34**
**Chicago, IL 60612**

**JACOB EVANS**
**28512 Middlebrook Way**
**Denham Springs, LA 70726**

**MARQUES TOWNES**
**19 Ciecko Court**
**Sayreville, NJ 08872**

**JERRON CAGE**
**5121 Golfside Drive**
**Lebanon, OH 45036**

**JERMAINE HALEY**
**14707 72A Avenue**
**Surrey, British Columbia**
**Canada**

**TROY CAUPAIN**
**7442 Southwind Drive**
**Chesterfield, VA 23832**

**NYSIER BROOKS**
**380 Hitchcock Road Unit 55**
**Waterbury, CT 06705**

**SPENCER MACKE**
**80 Canon Ridge**
**Ft. Thomas, KY 41075**

**DAXTER MILES**
**5303 Moravia Road Apt. B**
**Baltimore, MD 21206**

**AARON EPPS**
**111 Murrell Lane**
**Ball, LA 71405**

**TAYLER PERSONS**
**703 N. Phillips**
**Kokomo, IN 46901**

**TREVOR SCOTT**
**1279 Lecounte Road SW**
**Townsend, GA 31331**

**BENJAMIN MARK RICHARDSON**
**4307 W. 69th Street**
**Prairie Village, KS 66208**

**DAVID BELL**
**2360 Wellington Green Drive**
**Wellington, FL 33414**

**Plaintiffs,**

**vs.**

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**
700 W. Washington Street,
Indianapolis, Indiana 46204

**Defendant.**

---

Now come the Plaintiffs, and for their Complaint against Defendant, National Collegiate Athletic Association ("NCAA"), state as follows:

## I. <u>INTRODUCTION</u>

1. College football and college basketball are big business, encompassing over 350 colleges and universities, and with the annual NCAA College Football Playoff and March Madness NCAA basketball tournament being among the most popular and lucrative sports events in the world.

2. College football and basketball generate billions of dollars in revenue annually and there are hundreds of coaches and administrators at the NCAA and its member institutions and conferences with incomes exceeding $500,000 per year.

3. The highly competitive and entertaining nature of college sports attracts millions of fans who pay billions of dollars directly and indirectly for ticket sales, television and broadcast rights, merchandise sales, and other revenue streams.

4. For many decades, the NCAA has promulgated, adopted and enforced regulations that prohibited athletes from earning compensation for the services they provided on behalf of the NCAA and its member institutions and conferences. The athletes' services benefited the NCAA and its member institutions by generating interest and viewership of games, matches and tournaments in which athletes providing athletic

services were the attraction.  For many years over many decades, the only compensation that athletes were permitted under the NCAA rules, regulations and bylaws was a scholarship that paid for tuition, room and board, and other "education related expenses."  Colloquially, this was referred to as a strict prohibition of "pay for play" where the NCAA rules, regulations, and bylaws prohibited any compensation being paid to  athletes for performing athletic services.

5.      In 2021, the United States Supreme Court issued its decision in *NCAA v. Alston*, 594 U.S. 69, 141 S. Ct. 2141 (2021), which held that the NCAA held buyer-side monopoly power for the services of student-athletes and that the NCAA's regulations restrained trade in violation of the Sherman Act. And, in the years since *Alston*, the NCAA has clung to its prohibition of "pay for play" by maintaining its currently existing regulations, including its Bylaw 12.  In *Alston,* the Court recognized as undisputed by the NCAA, that the NCAA has monopoly power in the market, and that the NCAA regulations did, in fact, restrain trade by depressing or outright prohibiting compensation other than education-related expenses paid to the labor, *i.e.* the athletes providing services.

6.      The NCAA has previously defended itself, its conduct, and regulations by asserting a procompetitive purpose in the trade restraining regulations, arguing that there was a purpose and need to maintain and enforce its trade restraining conduct and regulations, that doing so was necessary to maintain the consumer base that pays for the tickets, merchandise, and media accessibility. The NCAA supported its restraint of trade by asserting a pro-competition defense, that consumers would not want to see college athletes compensated like pro athletes and that protecting the "amateurism" of college athletes was important to its consumer base.  That premise was rejected by the full

unanimous United States Supreme Court, and in the noteworthy concurring opinion of Justice Brett Kavanaugh. The Court held that the NCAA had created and maintained an admittedly anti-competitive market, wherein an athlete providing services to its members was restricted from being compensated at a rate that an open unrestricted market with bear. Each and every Plaintiff herein suffered a denial of compensation as a result of the NCAA's unlawful restraint of trade without a legitimate pro-competition purpose.

7. The NCAA and its member institutions have taken in billions in revenue and profits from its popular services and products while simultaneously denying the "labor"–the athletes most responsible for providing the product--any compensation for their services beyond scholarships and education-related expenses. It is clearly the services provided by the inadequately compensated labor, the athletes, that the consumer public pays to see. It is also the name, image, and likeness ("NIL") of the labor/athletes that are the subject of massive marketing efforts by the NCAA and its member institutions that generate tens of millions of dollars in revenue while, prior to the *Alston* decision, denying the athletes' the opportunity to receive any compensation for their services or exploitation of their name, image, and likeness.

8. After losing the case in *Alston*, the NCAA removed its ban on athlete compensation to the extent the compensation was "name-image-likeness" compensation. The NCAA adopted a number of interim policies restricting NIL compensation, including prohibiting the institutions themselves from being involved in the procurement or control of NIL deals. That led to the formation of "collectives", organizations formed essentially to collect money from alumni and boosters, as well as to negotiate and transact business with entities who wished to use college athletes in

promotional and marketing activities has adopted rules. Eventually, despite numerous attempts to restrict and impede the growth of collectives, the NCAA adopted Bylaw 22 on January 10, 2024, with language in Bylaw 22 pertaining to institutional involvement not being adopted until April 18, 2024. While Bylaw 22 purports to allow athletes to be compensated for the use of their "name – image and likeness", it also provides that NIL activities "may not be used to compensate a student athlete for athletic participation or achievement." Moreover, even in the immediate aftermath of the *Alston* decision, and despite the Court's holding that the NCAA and its conduct and regulations constituted antitrust violations by restraining trade, the NCAA still maintained, and maintains even now, its Bylaw 12, which summarily prohibits athletes from being paid to provide athletic services. In the immediate aftermath of *Alston*, the NCAA imposed restrictions on that severely restricted NIL compensation, available to athletes by requiring the member institutions to be uninvolved in NIL transactions. If an athlete wanted to market himself to local banks and car dealerships, the NCAA supposedly allowed that, so long as the college was not involved in the transaction. Eventually, the "collectives"-- organizations barely outside the college campuses--began to proliferate and the NCAA began to take the view that these "collectives" were vehicles through which colleges could indirectly compensate elite athletes. The market responded with exponential growth of NIL compensation to athletes. Before long, the independence of the collectives from colleges disappeared, and the universities and coaching staffs became intertwined in the movement of "NIL" money flowing to college players, albeit through the collective, a troubling, but necessary reality for compliance with the *Alston* decision. It is, as of early 2025, a chaotic system, wherein every college competes against every other

college for top athletes, restricted only by the extent of its collective fundraising capabilities, and its boosters' largesse.

9.      For decades, the NCAA and its members institutions also restricted the ability for athletes to market their services freely to member institutions by imposing a limitation that kept athletes bound to an institution by prohibiting athletes from transferring from one institution to another, without sitting out an entire year. In 2021, in addition to the *Alston* decision, the NCAA modified its regulations such that athletes – notably including football and basketball players - may go through the "transfer portal" and would be immediately eligible at the new member institution.

10.     The combination of transfer with immediate eligibility through the transfer portal, and the ease with which collectives can compensate players, has resulting in expensive bidding wars that have led to some players being compensated at extraordinary levels exceeding $5,000,000 (for example, Cooper Flagg, Sheduer Sanders, Arch Manning, Livvy Dunne among many others). It is increasingly common to read about many athletes coming out of high school or transferring to a college through the transfer portal with a price tag exceeding $1 million per season. Thus, the effect of the Supreme Court landmark ruling in *Alston* recognizing the buyer side monopoly power the NCAA has in the market for the services of the student athletes. Given the fact that prior NCAA restraints did harm competition, the NCAA has been forced to capitulate and to eliminate a great many restrictions on athletes' rights to be compensated, has resulted in the annual free agency of every athlete through the transfer portal, and skyrocketing compensation packages.   Although the NCAA continues to maintain Bylaw 12 prohibiting athletes from "using athletics skill (directly or indirectly) for pay in any form in that sport", the removal of most restrictions on NIL

compensation has led to a more market-driven system in which athletes can shop their services to the highest bidder, although it must be done through the façade of NIL money instead or "salary" or "pay for play" which offends the ongoing Bylaw 12 of the NCAA Regulations.

11.     The NCAA has ignored the warnings of Justice Kavanaugh in his concurring opinion in Alston wherein he suggests that all of the NCAA restrictions on compensation may be fair game for attack. "Nowhere else in America can businesses get away with agreeing not to pay their workers a fair market rate on the theory that their product is defined by not paying their workers a fair market rate," Kavanaugh wrote. "And under ordinary principles of antitrust law, it is not evident why college sports should be any different." Instead of thoughtfully addressing its restrictions of athletes' ability to be compensated, found most prominently in Bylaw 12, the NCAA has left the restraint of trade language in Bylaw 12.5.2.1 as follows:

> After becoming a student-athlete, a student-athlete shall not be eligible for participation in intercollegiate athletics if the student-athlete:
>
> (a) Accepts any remuneration for or permits the use of the student-athlete's name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind; or
>
> (b) Receives remuneration for endorsing a commercial product or service through the student-athlete's use of such product or service.

## II.  <u>PARTIES</u>

12.     Plaintiff Dontaie Allen is a resident and citizen Union, Kentucky, who was ranked in the top 50 in his class and was heavily recruited by many Power 5 schools. Dontaie signed with and played Division 1 basketball in the SEC at the University of Kentucky during the 2019-20, 2020-21 and 2021-22 seasons and subsequently played at Western Kentucky during the 2022-23 and 2023-24 seasons.  Dontaie transferred after

the 2023-24 season and is currently playing at the University of Wyoming for the 2024-25 season.

13.    Plaintiff Derrick Barnes is a citizen and resident of West Lafayette, Indiana, where he also attended college at Purdue University, enjoying a stellar 4 year college football career in the Big 10 at Purdue from 2017-2020, after being heavily recruited during his high school career in Covington, Kentucky.  Derrick earned All conference All Big 10 honors during his college career and was drafted by the NFL Detroit Lions after graduating from Purdue.

14.    Plaintiff Adam Kunkel is a resident and citizen of Burlington, Kentucky, who was recruited out of high school as one of the top ranked players in Kentucky his senior season.  Adam chose to attend Belmont University where he had great success, averaging almost 17 points per game during the 2019-20 season, after which he was given offers by many Power 5 schools.  Adam chose traditional top 20 power Xavier University over many offers from Power 5 schools and completed a successful college career from 2020-23 at Xavier.

15.    Plaintiff Malik Curry is a citizen and resident of the State of Delaware. For two seasons 2019-2021 Malik attended the University of Delaware on a full Grant-in-Aid scholarship.   In the final season of his college eligibility, 2021-22, Malik transferred to West Virginia University where he had an all Big 12 year as a fifth year senior.

16.    Plaintiff Erik Stevenson is a citizen and resident of the District of Columbia who chose to begin his college basketball career at Wichita State University, in spite of receiving many Power Five offers, playing for two seasons at Wichita State from 2018 to 2020. He then transferred to the Pac 12's University of Washington for a season

in 2019, then to University of South Carolina from 2021-22. He concluded his college career with West Virginia in 2022-23, earning all-conference honors.

17.    Plaintiff Donte Ingram is a citizen and a resident of Chicago, Illinois, who played four historic years of college basketball at Loyola Chicago from 2014-2018. In spite of Loyola Chicago not playing in a Power Five conference, Donte led them all the way to the Final Four his senior season in 2017-18 while garnering all-conference honors as a senior.

18.    Plaintiff Romar Reid is a resident and citizen of Mt. Vernon, New York, who played three years of Division 1 basketball at Manhattan University from 2019-2023.

19.    Plaintiff Cam Taylor Britt is a resident and citizen of Dalton, Georgia, who had a successful all conference caliber career at Nebraska from 2018-2021.

20.    Plaintiff Kam Williams is resident and citizen of Dallas, Texas, who, after a legendary high school basketball career in Baltimore and being one of the top recruits in the country, was a 1,000 point scorer during a strong 4 year college basketball career in the Big Ten playing for the Ohio State Buckeyes from 2014-2018.

21.    Plaintiff Cameron Krutwig is a citizen and resident of Dundee, Illinois, who became famous during a 4 year college basketball career at Loyola Chicago, from 2017-22. Loyola advanced to the Final Four in 2018 and the Sweet 16 in 2022, with Cameron scoring over 1,800 points and 946 rebounds, culminating in being named to the All America team in 2021.

22.    Plaintiff Vincent "Tre" Mitchell is a citizen and resident of Canonsburg, Pennsylvania, who had an outstanding 5 year college basketball career scoring over 1,600 points and grabbing almost 800 rebounds, with over 250 assists, over 100 blocks

and over 100 steals, during his notable career, including two years at the University of Massachusetts from 2019-21, a year at the University of Texas in the SEC from 2021-22, a year at Big 12 Power West Virginia University 2022-23, and his last year at the legendary University of Kentucky basketball program in 2023-24.

23.    Plaintiff Matt Cross is a citizen and resident of Beverly, Massachusetts, who began a successful college career after being one of the nation's top recruits coming out of high school, beginning with a year at the University of Miami in the ACC in 2020-21, followed by a year at the University of Louisville in the Big East in 2021-22. Matt continued his college career with impressive stat lines in 2022-24 in the Atlantic 10 with the University of Massachusetts, with an outstanding fifth year playing for Southern Methodist University in the ACC in 2024-25.

24.    Plaintiff Marc Loving is a resident and citizen of Toledo Ohio, who was an elite level, top 50 recruit coming out of high school in 2013, and then went on to a long and distinguished four year career playing for the Ohio State Buckeyes from 2013-2017, being the team's leading scorer during 2015-16 during which he was received Big All Conference honors, followed by another strong senior season in 2016-17.

25.    Plaintiff C. J. Jackson is a resident and citizen of Phoenix, Arizona, who was a top recruit and JUCO All American with numerous Power 5 school offers in 2016. C. J.  chose to attend Ohio State and played 3 years of college basketball from 2016-2019 at the Power 5 level in the Big 10, averaging over 10 points per game over his career while also grabbing 3.5 rebounds per game, with 3.4 assists per game.

26.    Plaintiff Derek Culver is a resident and citizen of Campbell, Ohio, who was an elite 5 star high school basketball recruit coming out of high school in 2017. Derek chose to attend West Virginia University, and traditional basketball power playing in a

Power 5 conference, the Big 12. Derek had a tremendous three-year career at West Virginia, being named to the All-Freshman team and 2nd team All-Big 12 in 2018-19, All Big 12 Honorable Mention in 2019-20 and All-Big 10 First Team in 2020-21, after which he entered the NBA draft.

27.    Plaintiff Nate Adrian is a resident and citizen of Morgantown, West Virginia, who was heavily recruited out of high school as the Number 1 player in West Virginia who went on to a successful 4 year college basketball career at West Virginia University, playing in the Power 5 Big 12 Conference.

28.    Plaintiff Tajzmel Sherman is a resident and citizen of Missouri City, Texas, who was heavily recruited as a JUCO All American and chose to attend West Virginia University where he played Power 5 Big basketball from 2019-22, averaging almost 18 points per game in 2021-22a and achieving Big 12 honors.

29.    Plaintiff Filip Petrusev is a citizen of Serbia who was one of the top basketball recruits in the United States out of Montverde Academy. Filip chose to play college basketball at powerhouse Gonzaga University, and after his second year at Gonzaga in 2019-20 during which the team went 31-2 and he averaged 18 points and 8 rebounds per game, Filip was named the West Coast Conference Player of the year and 2nd team All American.

30.    Plaintiff Nigel Johnson is a resident and citizen of Ashburn, Virginia, who played four seasons of Power Five college basketball at Kansas State University from 2013-2015 in the Big 12, followed by a year at Rutgers in the Big 10 in 2016-17 during which he averaged 11 points, three rebounds and two assists per game. He was named to the Preseason All ACC third team in 2017-18 after transferring to the University of Virgina.

31.    Plaintiff Lucas Williamson is a resident and citizen of Chicago, Illinois, who played five years of college basketball at Loyola Chicago from 2017-2022, during which Loyola advanced to the Final Four and Sweet Sixteen and Lucas was a decorated multiple times as the conference defensive player of the year, first team all-conference, second team all-conference, and conference tournament MVP, among other accolades.

32.    Plaintiff Jacob Evans is a resident and citizen of Denham Springs, Louisiana, who played basketball at the University of Cincinnati from 2015-18, earning first team all-conference honors in 2018 during his junior year, ultimately being a first round NBA draft pick.

33.    Plaintiff Marques Townes is a resident and citizen of Sayreville, New Jersey, who played Division 1 college basketball at Fairleigh Dickinson from 2014-2016 and at Loyola Chicago from 2017-2019.  He helped lead Loyola to the NCAA tournament Final Four in 2018 and in 2019 he was named the MVC Player of the Year.

34.    Plaintiff Jerron Cage is a resident and citizen of Lebanon, Ohio, who was heavily recruited as one of the top overall football prospects in the country, and he went accepted an offer from historical powerhouse Ohio State where he played 5 years from 2018-2022.

35.    Plaintiff Jermaine Haley is a resident and citizen of British Columbia, Canada, who played college basketball at New Mexico State University from 2016-2017 and at Power 5 Big 12 West Virginia University form 2018-2020 where he started all 30 games his senior season averaging 9 points, 4 rebounds and 2 assists per game.

36.    Plaintiff Troy Caupain is a resident and citizen of Chesterfield, Virginia, who played college basketball at the University of Cincinnati from 2013-2017, being

named all-conference first team in 2015-16 averaging 13 points, 5 assists and 4 rebounds per game among other tournament accolades.

37.     Plaintiff Nysier Brooks is a resident and citizen of Waterbury, Connecticut, who played Division 1 college basketball at the University of Cincinnati from 2016-19, and at University of Miami during the 2020-21 season and at the University of Mississippi from 2021-22.

38.     Plaintiff Spencer Macke is a resident and citizen of Ft. Thomas, Kentucky, who was recruited out of high school as the only player to lead the State of Kentucky in scoring (35 PPG) and rebounding (15 RPG) in the same season and he went on to play Power 5 basketball at West Virginia University from 2019-2021.

39.     Plaintiff Daxter Miles is a resident and citizen of Baltimore, Maryland, who was heavily recruited as a top 100 player in the country in high school and who chose to play college basketball at West Virginia University.  He started every game his freshman year of 2014-15, and remained a starter throughout his 4 year career at West Virginia from 2014 to 2018.

40.     Plaintiff Aaron Epps is a resident and citizen of Ball, Louisiana, who played Power 5 basketball at Louisiana State University in the SEC.

41.     Plaintiff Tayler Persons is a resident and citizen of Kokomo, Indiana, who played Division 1 college basketball beginning in 2014-15 at Northern Kentucky University where he averaged 13 points and 5 rebounds a game as a freshman.  Tayler transferred to Division 1 Ball State University and played there for three years, each year averaging at least 15 points, 3 rebounds and 4 assists per game, and he was offered and declined by a lot of Power 5 schools who could not and did not offer any compensation.

42.    Plaintiff Trevor Scott is a resident and citizen of Townsend, Georgia, who played Division 1 basketball at the University of Cincinnati from 2016-2020.

43.    Plaintiff Benjamin Mark Richardson is a resident and citizen of Prairie Village, Kansas, who played Division 1 college basketball at Loyola Chicago from 2014-2018. During the 2017-18 season when Loyola advanced to the NCAA Final Four he was honored as the MVC Defensive Player of the Year, as All MVC Tournament and as NCAA Tournament All Region.

44.    Plaintiff David Bell is a resident and citizen of Wellington, Florida, who played Division 1 college basketball in the Big Ten at Ohio State during the 2015-16 and 2016-17 seasons and subsequently transferred to Jacksonville for the 2018-19 and 2019-20 seasons.

45.    Defendant, National Collegiate Athletic Association ("Defendant" or "NCAA"), describes itself as an unincorporated, not-for-profit educational organization and maintains its principal place of business at 700 W. Washington Street, Indianapolis, Indiana 46204. The NCAA is composed of more than 1,100 colleges, universities, and athletic conferences located throughout the United States.

46.    Through its Constitution and Bylaws, the NCAA and its members have adopted extensive regulations that govern all aspects of college sports. And, the NCAA actively enforces its regulations by imposing penalties on athletes and members to ensure compliance.

### III.  JURISDICTION AND VENUE

47.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1337, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §15 and 15 U.S.C. §26.

48.     Venue is proper pursuant to 28 U.S.C. §1391(b) and (c) as well as 15 U.S.C. §§ 15 and 12 because Defendant resides, is found, has agents, and transacts business in this District.

49.     This Court has personal jurisdiction over Defendant because it: a) transacted business in this District; b) participated in organizing intercollegiate athletics contests and licensed and sold merchandise in this District; c) had and has substantial contacts in this District; and d) was engaged in an anticompetitive conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

50.     Defendant, NCAA, has seven Division 1 schools located in the Commonwealth of Kentucky, many of which are located within this District.

## IV.  FACTS

51.      Defendant unlawfully used its monopoly power to restrain trade and specifically to deprive Plaintiffs from being compensated the fair market value for the services they were providing and they deprived Plaintiffs their rights to their names, images, and likenesses.

52.     Throughout their college careers, Plaintiffs were prohibited from being compensated in any manner, directly or indirectly by the college benefitting from their services, including a prohibition of being paid for providing valuable athletic services that generated revenue for the Defendant, Plaintiffs were prohibited from endorsing any commercial product, and Plaintiffs were further prohibited from obtaining any monetary benefit from the notoriety derived from their athletic endeavors.

53.     At the time Plaintiffs played college sports, Defendant required them not only to compete without remuneration--other than education-related expenses--and to

cede control of their publicity rights to them in perpetuity or else forfeit their right to compete.

54.    Meanwhile, Defendant required Plaintiffs to provide elite level athletic skills and to participate in the promotion of college sports product through the use of their names, images, and likenesses in advertising and interaction with sports donors and the media while Defendant reaped all of the benefits from the promotion.

55.    NCAA has had and continues to have complete control over the labor market for Division I college athletes and has defined itself as the paramount level of competition in college sports.  As a result, there are no reasonable substitutes for the educational and athletic opportunities offered by Division I schools, and the NCAA controls virtually all college sports.

56.    The NCAA has utilized the disparity in bargaining power it has to coerce student-athletes into providing their highly valued athletic services without being fairly compensated for such, to give up their publicity rights not only while they are college athletes but also well beyond the end of their college careers.

57.    Former players have never been fairly compensated for the value of the athletic services they provided or for the continuing use of their names, images, and likenesses, all to the clear commercial advantage of Defendant who, with its members and conferences, has made billions of dollars from the efforts of Plaintiffs.

58.    Defendant engaged in a contract, combination, and conspiracy consisting of horizontal and vertical agreements that artificially depressed the prices in the market for the labor of student-athletes and fixed those prices at or near zero.

59.    Defendant's actions constitute an unreasonable restraint of trade.

60.     The relevant markets are the nationwide markets for the labor of Plaintiffs, NCAA Division I college athletes, in the sports in which they compete. Defendant's member institutions compete to recruit and retain Plaintiffs and other athletes utilizing scholarships and other academic-related services. Plaintiffs were required to relinquish and assign to Defendant and its member institutions their name, image, and likeness for the privilege of providing labor without compensation for their valuable their name, image, and likeness.

61.     The NCAA Division I institutions and conferences compete in the relevant labor markets and conspire and collude with Defendant to fix the maximum price paid to athletes in exchange for the commercial use of their name, image, and likeness.

62.     The actions of Defendant, which are ongoing to the present day, constitute an unreasonable restraint of trade that prohibited Plaintiffs from being compensated for the market value of their services and eliminated competition in the market for the publicity rights of student athletes, and unreasonably restrained trade.

63.     The resulting harm to Plaintiffs is obvious in that they have been deprived, and continue to be deprived, of the compensation they would receive in an open market.

64.     Meanwhile, Defendant has made hundreds of millions, if not billions, of dollars.

## V.  CLAIMS

### A.     COUNT 1 – Violation of Section 1 of the Sherman Act – Unreasonable Restraint of Trade

65.     Plaintiffs hereby incorporate by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

66.     Defendant, through its own acts, the acts of its officers, directors, employees and other agents and representatives, and the acts of its co-conspirators, has entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the relevant market to illegally and artificially fix, depress, and/or maintain the compensation paid for the athletic services provided by Plaintiffs, and has denied Plaintiffs the rights to be compensated for their publicity rights, including name, image, and likeness rights, by artificially fixing, depressing, and/or maintaining the compensation paid for such when a relevant free market would pay Plaintiffs significantly more.

67.     Defendant's unlawful conduct deprived and continues to deprive Plaintiffs compensation for the athletic services they provided and for the use of their names, images, and likenesses, and has artificially depressed compensation to Plaintiffs.

68.     Defendant's conduct has no legitimate procompetitive purpose, and no other legitimate or legal purpose and Defendant's conduct has no relationship to any alleged goal of "amateurism," or any legitimate procompetitive purpose.

69.     Defendant's conduct is in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

70.     As a direct and proximate result of Defendant's conduct, Plaintiffs have been and continue to be damaged financially including, limiting and depressing the compensation to Plaintiffs for use of their NILs.

71.      Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover treble damages, attorneys' fees, and costs.

**B.**  **COUNT 2 – Violation of Section 1 of the Sherman Act – Group Boycott/Refusal to Deal**

72.     Plaintiffs hereby incorporate by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

73.     Defendant, through its own acts, the acts of its officers, directors, employees and other agents and representatives, and the acts of its co-conspirators, has entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the relevant market creating a horizontal group boycott of Plaintiffs. Defendant's group boycott/refusal to deal encompasses Defendant's concerted acts to prevent Plaintiffs from being compensated for use of their images, likenesses and/or names and/or their concerted refusal to permit compensation to be paid to members of the Classes for use of their images, likenesses and/or names, in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

74.     Defendant's unlawful conduct had the intended effect of denying or diminishing compensation to Plaintiffs for the value of athletic services provided by them and for the value of their names, images, and likenesses, and thereby to refuse to permit compensation to be paid to Plaintiffs.

75.     Defendant has used its power over Plaintiffs to require them to forever relinquish their control over their names, images, and likenesses in perpetuity in exchange for the ability to participate in college athletics, thereby foreclosing them from the market.

76.    Defendant unlawfully used its superior bargaining position in the denial or diminution of any compensation or royalties for the continued use of the names, images, and likenesses for profit.

77.    The Defendants and their co-conspirators' conduct is in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

78.    As a direct and proximate result of the Defendant's conduct, the Plaintiffs have been and continue to be damaged financially including, limiting and depressing the compensation to Plaintiffs for use of their NILs.

79.    Pursuant to Section 4 of the Clayton Act, the Plaintiffs are entitled to recover treble damages, attorneys' fees, and costs.

**C.    COUNT 3 – Unjust Enrichment**

80.    Plaintiffs hereby incorporate by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

81.    At all times relevant herein, Plaintiffs expended substantial labor and efforts in providing athletic services that directly benefited Defendant and in the pursuit of their collegiate athletic careers, which added substantial value to their names, images, and likenesses.

82.    Through their conduct as alleged herein, Defendant misappropriated the names, images, and likenesses of Plaintiffs.

83.    The labor and efforts expended by Plaintiffs resulted in increased revenue for Defendant, and at all times relevant herein, Defendant was aware of the benefits being conferred upon them by Plaintiffs.

84.    Retention of the benefits by Defendant without payment to Plaintiffs would be unjust and unconscionable under the circumstances.

85.    Defendant should be required to disgorge all of its illegal profits resulting from the wrongful conduct described herein, and a constructive trust should be established to allow Plaintiffs to seek restitution.

## VI.  **DEMAND FOR RELIEF**

Plaintiffs therefore request the following relief:

1.    Damages according to the proof at trial and treble damages pursuant to 15 U.S.C. §15;

2.    Attorneys' fees, costs, and expenses; and,

3.    Such other and further relief as the Court deems just and proper.

## VII.  **JURY DEMAND**

Plaintiffs demand a trial by jury in this matter.

DATED this 31st day of January, 2025

By:    /s/R. Christian Macke
R. Christian Macke
10 W. 4th Street
Newport, KY 41071
Tel: (859) 261-0012
chrismacke@fuse.net

and

/s/Robert R. Sparks
Robert R. Sparks (Ky. Bar #83685)
*rrsparks@strausstroy.com*
STRAUSS TROY CO, LPA
150 East Fourth Street
Cincinnati, OH 45202
Tel:  (513) 621-2120
rrsparks@strausstroy.com

*Attorneys for Plaintiffs*

17358457.1

23